# FAX COVER SHEET

| | |
|---|---|
| TO | Adam LeBerthon |
| COMPANY | Glaser Weil |
| FAX NUMBER | 13108432630 |
| FROM | Marc Randazza |
| DATE | 2012-11-20 18:39:00 GMT |
| RE | Documents from Randazza Legal Group for A. LeBerthon |

## COVER MESSAGE

Mr. LeBerthon,

Attached please find the expert report from David Ardia and the Appendix to his report. We received these items this morning, November 20, 2012.

Thank you.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ZHANG ZIYI, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>CHINA FREE PRESS, INC., a North Carolina non-profit corporation doing business as BOXUN NEWS; WEICAN NULL MENG, an individual known as WATSON MENG and also WEICAN "WATSON" MENG; DOES 1-25, inclusive,<br><br>Defendants. | Case No. CV12-5216-DMG (PLAX) |

## EXPERT REPORT OF DAVID S. ARDIA, ESQ.

1. My name is David S. Ardia. My business address is: University of North Carolina, Van Hecke-Wettach Hall, Campus Box 3380, Chapel Hill, NC 27599.

2. I have never served as an expert witness before in either state or federal court.

3. I am being compensated by Mr. Watson Meng for my services in this matter at the rate of $350 per hour.

## QUALIFICATIONS

4. I am an assistant professor of law at the University of North Carolina (UNC) School of Law and the faculty co-director of the UNC Center for Media Law and Policy. I also hold a secondary appointment as an assistant professor at the UNC School of Journalism and Mass Communication and am a faculty associate at the Berkman Center for Internet & Society at Harvard Law School.

5. I have a J.D. degree from Syracuse University College of Law and an LL.M. from Harvard Law School. My CV is included in the Appendix to this report.

6. I have more than 15 years of experience in media law. Before joining the UNC faculty, I founded and directed the Berkman Center's Digital Media Law Project. Prior to going to Harvard, I was assistant counsel at The Washington Post, where I provided pre-publication review and legal advice on First Amendment, newsgathering, intellectual property, and general business issues.

7. I served as a law clerk for Judge Conrad Cyr on the United States Court of Appeals for the First Circuit and for Judge Thomas McAvoy on the United States District Court for the Northern District of New York.

8. After clerking, I practiced law at Williams & Connolly in Washington, DC, where I handled a range of media and intellectual property litigation. While at Williams & Connolly, I performed pre-publication libel review for the *National Enquirer* and *In Touch Weekly*.

9. I am a member of the Online News Association's Legal Advisory Board and the First Amendment and Media Litigation Committee of the American Bar Association. I am a former member of the Newspaper Association of America's Legal Affairs Committee.

10. I am admitted to practice law in the District of Columbia, Massachusetts, and New York.

11. I have extensive experience providing media law training for journalists and lawyers. In addition to the training I provided to my clients' reporters and editors, over the past three years I have provided annual training to members of the Online News Association. I currently teach Torts and Media Law at the UNC School of Law.

12. I have extensive experience performing pre- and post-publication libel review for newspapers and magazines, including *The Washington Post*, *National Enquirer*, and *In Touch Weekly*.

## MATERIALS REVIEWED

13. As part of my assignment, I have reviewed the complaint filed by Zhang Ziyi in this case, the expert report and declaration of Mary Hausch, the declaration of Professor Karen List, and the declaration of Ye "Ken" Wang, as well as their associated appendices. I have also reviewed the transcripts of the deposition of Watson Meng dated October 12, 2012 (volume I) and October 17, 2012 (volume II). Additionally, I have reviewed a number of background documents provided by Mr. Meng and his counsel. A complete list of the documents I reviewed is included in the Appendix to this report.

14. I met with Mr. Meng for approximately 5 hours on November 14, 2012 to discuss his reporting of the news articles at issue in this case. Prior to my meeting with Mr. Meng on November 14, I had no knowledge of him or Boxun News.

15. I do not speak or read Mandarin. My conversation with Mr. Meng was conducted in English, without the need for or aid of an interpreter. Although some documents in Mandarin were provided to me, I did not rely on them for this report unless an English translation was provided.

16. I continue to review materials and documents related to this case and reserve the right to supplement this expert report based on any additional work that I may be asked to do.

## BACKGROUND

17. I have been asked to conduct a post-publication libel assessment of the news articles that are at issue in this case. Such assessments are often conducted by lawyers at news organizations when the subject of a story has complained of inaccuracies in a published story. The aim of a post-publication libel assessment is to determine whether there is any merit to the complaint and to assess whether a correction or retraction is warranted.

18. Other than the unsupported denials in the plaintiff's complaint, I am not aware of any information submitted by the plaintiff that shows that the defendants' news reports were false. Accordingly, the focus of my post-publication review is on Mr. Meng's reporting process and whether, at the time he published the news stories that are at issue in the instant lawsuit, he entertained serious doubts as to the truth of what he published.

19. In my professional opinion, there is no basis to correct or retract the stories at issue in this case. Mr. Meng neither knew that the information he published about Ms. Zhang Ziyi was false nor did he entertain serious doubts as to the truth of what he published.

## BASES OF OPINION

20. As stated in paragraph 8 of plaintiff's Complaint, Ms. Zhang "is an internationally renowned motion picture actress" who has appeared in numerous films in the United States. Ms. Zhang is therefore a "public figure" for purposes of defamation law. As a public figure, Ms. Zhang must prove that when Mr. Meng published the allegedly defamatory statements about her he did so with actual malice; that is, that he published the information knowing it was false or that he "entertained serious doubts as to [its] truth." *Readers Digest Ass'n v. Superior Court*, 37 Cal. 3d 244, 256-57 (1984).

21. There are no hard and fast rules for assessing whether a reporter has published information with actual malice. The inquiry is one that goes to the subjective state of mind of the reporter. Various factors can go into making this assessment, but their salience will vary depending on the specific circumstances that existed at the time of publication. These factors can include: the quality and reliability of the reporter's source or sources; the extent of the reporter's investigation; and the existence of corroborating or contradictory information.

*Mr. Meng's Sources*

22. It is my opinion that Mr. Meng acted reasonably in relying on the sources described below and that he neither knew that the information they provided was false nor did he entertain serious doubts as to the truth of the information they provided.

23. Mr. Meng stated to me that he relied on at least three different sources when he reported the stories at issue in this case. I've designated the individuals he relied on as sources A, B, and C for the sake of this report. He did not tell me the names of sources A and B. Mr. Meng stated that sources A and B are located in China and the disclosure of their names or other identifying details would put them at risk of arrest or death. In my experience, it is not unusual for reporters and editors to rely on anonymous sources when reporting on government corruption.

24. Mr. Meng described Source A as a "citizen journalist" who provided information to him on corruption within the Chinese government. Source A was the primary source for the information about Zhang Ziyi's sexual relationships with Xu Ming and Bo Xilai and about the payment of money by Mr. Xu to Ms. Zhang. Source A was also the primary source for the information about Ms. Zhang being under investigation in China.

25. Mr. Meng acted reasonably in relying on Source A and there was no reason for Mr. Meng to believe, at the time of publication, that any of the information Source A provided to him was false.

26. First, Mr. Meng had previously worked with Source A for several years, and Source A had proven to be reliable. Prior to the news articles at issue in this case, Source A had contributed to approximately 20 stories over a two-year period that Mr. Meng published on Boxun News. Mr. Meng stated that he was aware of no errors in any of the stories contributed by Source A. Moreover, Source A had proven to be reliable with regard to the type of allegations involved in this lawsuit. Beginning in February 2012, Source A began providing Mr. Meng with non-public information about corruption involving Bo Xilai and Wang Lijun. That information was confirmed for Mr. Meng when Chinese authorities arrested Mr. Bo in March 2012 and when the *Financial Times* commended Boxun News in April 2012 for its accurate reporting on the unfolding scandal involving Mr. Bo.

27. Mr. Meng also found Source A to be credible because of the high degree of detail Source A provided about Ms. Zhang's relationships with Mr. Bo and Mr. Wang.

28. Second, it was reasonable for Mr. Meng to rely on Source A's sources and the investigation conducted by Source A. As noted previously, Mr. Meng regarded Source A as a follow journalist and had found the information he/she previously provided to be reliable.

29. Mr. Meng stated that Source A told him the information about Ms. Zhang came from Xu Ming, a businessman in China who as arrested as part of the corruption case against Bo Xilai. Mr. Xu allegedly had a sexual relationship with Ms. Zhang and arranged her relationship with Mr. Bo, so he would therefore have first-hand knowledge of the facts at issue in this case. Source A told Mr. Meng that the information from Mr. Xu was originally leaked by interrogators associated with China's Central Discipline Committee (CDC). Mr. Meng did not ask Source A the name of the initial sources associated with the CDC because he understood that Source A relied on promises of confidentiality to his/her sources in order to gather information from within the Chinese government.

30. Given Source A's track record of reliability, it was reasonable for Mr. Meng to rely on Source A's due diligence and assessment of his/her source's credibility. Moreover, Mr. Meng stated that he had previously relied on information provided by sources associated with the CDC and that the information had proven to be accurate.

31. Third, Mr. Meng had no reason to doubt the veracity of the information Source A provided. Mr. Meng stated that Source A had no known biases or reasons to be untruthful with regard to the information he/she provided about Ms. Zhang.

32. Mr. Meng worked with Source A for approximately two years prior to publishing the news reports at issue in this case. During that time period, Mr. Meng consistently found Source A to be accurate and reliable.

33. Fourth, as described in the following paragraphs, Mr. Meng had information from other sources that corroborated the information Source A provided, which led to his conclusion that the information provided by Source A was accurate.

34. Source B was described by Mr. Meng as an entertainment industry insider. Source B provided information about Zhang Ziyi's relationships with men in the movie business, her lifestyle and ownership of real estate, and the "Splash Ink Incident."

35. Mr. Meng stated that Source B told him that Ms. Zhang's earnings from movies would not be sufficient to support her lifestyle and that she was someone who lived off the largess of wealthy men. Source B also told him that Ms. Zhang engaged in sexual relationships with these men and received money, jewelry, and real estate from them.

36. Mr. Meng stated that Source B also provided him with background information on the "Splash Ink Incident" in which a poster of Ms. Zhang was defaced following a report in the Chinese media in 2010 about Ms. Zhang's sexual relationship with a wealthy businessman in Shanghai. According to Source B, Ms. Zhang was known in the entertainment industry for having affairs with wealthy men.

37. Mr. Meng had no reason to doubt Source B's veracity. Mr. Meng stated that Source B had no known biases or reasons to be untruthful with regard to the information he/she provided about Ms. Zhang.

38. Source C was identified by Mr. Meng as Zhao Yan, a freelancer reporter who had formerly worked for the *New York Times* in China. Mr. Zhao provided information about another businessman who claimed to have paid Ms. Zhang for sex.

39. Mr. Meng stated that Chinese authorities arrested Mr. Zhao in 2004 due to his work as a journalist for the *New York Times*. While in prison, Mr. Zhao's cellmate, a Chinese businessman, told him that he had paid Ms. Zhang 6 million RMBY for sex. Because this was same amount Source A had told him that Ms. Zhang received for sex with Xu Ming, it led Mr. Meng to conclude that the information he had received from Source A was accurate.

40. Mr. Zhao told Mr. Meng that the Chinese authorities had incarcerated his cellmate under a fake name because of the political scandal he was involved in, and that he did not know his cellmate's true name. Mr. Meng was unable to contact the cellmate directly because Mr. Zhao told him the cellmate had moved New Zealand.

41. Mr. Meng stated that Mr. Zhao had been a source of his for nearly a decade, initially anonymously while in China and then on the record when Mr. Zhao moved to the United States. Mr. Meng stated that the information he received from Mr. Zhao was consistently reliable.

42. Mr. Meng had no reason to doubt Mr. Zhao's veracity. Mr. Meng stated that Mr. Zhao had no known biases or reasons to be untruthful with regard to the information he provided about Ms. Zhang.

*Investigation Conducted by Mr. Meng*

43. Based on the information available to Mr. Meng at the time he published the news articles at issue in this case, the past reliability of his sources, and the lack of evidence casting doubt on the accuracy of the information he received from his sources, he was under no legal obligation to conduct an independent investigation of the facts before

publishing. Nevertheless, Mr. Meng did conduct an investigation that turned up further corroborating information.

44. Prior to publishing the news articles at issue in this case, Mr. Meng had been working with Source A for several years and had, as early as February of 2012, begun receiving information from Source A about a corruption investigation involving Bo Xilai and Xu Ming. In February, Mr. Ming began publishing some of the information Source A provided about Mr. Bo and received accolades from western news organizations for the accuracy of that reporting.

45. Source A contacted Mr. Meng via email in May 2012 with more information about corrupt behavior by Mr. Bo and Mr. Xu that implicated Zhang Ziyi. Initially via email, and then through telephone calls, Mr. Meng communicated with Source A as he began investigating the story. In dealing with his confidential sources in China, Mr. Meng eschewed the use of email and deleted emails shortly after reading them. In my experience, this is a very common practice for journalists who report on government corruption or national security issues.

46. Mr. Meng stated that his first reaction to the information Source A provided about Zhang Ziyi's relationships with Bo Xilai and Xu Ming was that the amount of money involved seemed very high. Source A had told him that Ms. Zhang had received 1.4 billion RMBY over a 10 year period from men with whom she had had sexual relationships. Mr. Meng stated, however, that he was not surprised to hear that Ms. Zhang had a sexual relationship with Mr. Xu and Mr. Bo and that she was receiving money from Mr. Xu because such behavior was, according to news reports within China, common for high level officials and well known.

47. In March 2012, Bo Xilai disappeared from public view and Xu Ming was arrested. Led by Boxun News, western news organizations began reporting on the unfolding scandal that was roiling China's leadership.

48. In May 2012, Mr. Meng began searching news sources both within and outside China to see what had been reported about Zhang Ziyi. Mr. Meng found several news reports that he felt corroborated the information he received from Source A about Ms. Zhang. A January 2010 report published on Sohu.com stated that Zhao Xinyu, a well connected woman in the entertainment industry, had arranged for Ms. Zhang to meet a wealthy businessman in Shanghai who was identified only as "Mr. A." The report said Mr. A might get divorced so he could be with Ms. Zhang and that he gave her 200 million RMBY in cash, jewelry and real estate. Mr. Meng stated that the report implied that sex was involved in the relationship between Mr. A and Ms. Zhang. Mr. Meng noted that Ms. Zhang sued Ms. Zhao, who was a source for that story, around 2009-2010 and that the case settled with undisclosed terms in 2010. Mr. Meng stated that the lawsuit did not affect his view of the article's truth and that he felt the news source was reliable.

49. As part of his investigation of Ms. Zhang, Mr. Meng also uncovered an article on Sina.com that reported that Ms. Zhang was having affairs with Zhang Yimou, a famous movie director, other movie stars, and rich businessman and that "Zhang Ziyi has long been having two or more boyfriends at the same time." Mr. Meng stated that these news reports showed a pattern of behavior by Ms. Zhang that was consistent with the information he had received from his sources.

50. Mr. Meng also found contemporaneous news reports that stated that Ms. Zhang had missed important international movie events that she was scheduled to attend. Mr. Meng stated that these reports were consistent with Source A's statement that Ms. Zhang was under investigation and unable to leave China in May 2012.

51. Mr. Meng also attempted to investigate other information he received from his sources. He sought to contact Mr. Zhao's cellmate who had stated that he paid Ms. Zhang 6 million RMBY for sex. These efforts were stymied because the man was incarcerated under a fake name and had, according to Mr. Zhao, moved to New Zealand after his release. He also sought to confirm what property Ms. Zhang owned in China, but was unable to do so because China does not allow public access to real estate records. Mr. Meng did state, however, that he was able to find some evidence on the Internet that supported his sources' assertions that she had considerable property holdings.

52. Mr. Meng sought to contact Ms. Zhang, but could not find any way to reach her. Mr. Meng also had no way to reach Xu Ming, who was in jail, or Bo Xilai, who had disappeared from public view as of March 2012.

53. Although the information Mr. Meng had collected was sufficient to publish the news articles and he was under no legal obligation to contact Ms. Zhang for comment, he stated that he thought it was important to include a comment from Ms. Zhang because it would provide more information to readers about this important corruption scandal in China.

54. Mr. Meng stated his belief that even if he were able to find a contact address for Ms. Zhang, she or her handlers would have ignored his request. Mr. Meng stated that the culture in China is to ignore the private media and that Chinese celebrities typically do not respond to media requests for comment. He also stated that it will put the journalists working for Boxun News at risk of arrest if the celebrity complains to the authorities.

*Corroborating Information*

55. In my opinion, Mr. Meng would have been legally entitled to publish the stories at issue in this case based solely on the information he received from Source A. Source A had a track record of being a reliable and accurate source for Mr. Meng and there were no obvious reasons to doubt the accuracy of the information Source A provided. Nevertheless, as described above, Mr. Meng did conduct an investigation that uncovered corroborating information.

56. First, the information Mr. Meng received from Source B was consistent with the general description of Ms. Zhang that Source A provided. Mr. Meng stated that Source B told him that Ms. Zhang's earnings from movies would not be sufficient to support her lifestyle and that she engaged in sexual relationships with businessmen and received money, jewelry, and real estate from them.

57. Second, the information Mr. Meng received from Zhao Yan was highly confirmatory of the statement by Source A that Xu Ming had given Ms. Zhang 6 million RMBY for sleeping with him. Mr. Zhao told Mr. Meng that a Chinese businessman had told him that he had paid Ms. Zhang 6 million RMBY for sex, an amount that matches precisely the amount provided by Source A.

58. Third, in addition to receiving corroboration from his sources, Mr. Meng reviewed news reports that he felt confirmed the information he received from his sources. Prior to publishing the stories at issue in the case, Mr. Meng found several Chinese news sources reporting that Ms. Zhang had been in relationships with wealthy businessman and that these men had given her millions in cash, jewelry, and real estate. Contemporaneous news reports also stated that Ms. Zhang had missed important international movie events that she was scheduled to attend, which was consistent with Source A's statement that Ms. Zhang was under investigation and unable to leave China.

59. Mr. Meng stated that he found no information that contradicted the information he had received from his sources.

## CONCLUSION

60. In summary, there is no basis to correct or retract the stories at issue in this case. Mr. Meng neither knew that the information he published about Ms. Zhang was false nor did he entertain serious doubts as to the truth of what he published. Mr. Meng acted reasonably in relying on the sources described above. None of his sources had given him any reason to question their credibility. In fact, his primary source had a long track record of providing reliable information about corruption investigations in China.

61. Based on the information available to Mr. Meng at the time he published the news articles at issue in this case, the past reliability of his sources, and the lack of evidence casting doubt on the accuracy of the information he received from his sources, he was under no legal obligation to conduct an independent investigation of the facts before publishing. Nevertheless, Mr. Meng did conduct an investigation that turned up further corroborating information.

62. Mr. Meng has experience reporting on corruption in the Chinese government. He also has experience utilizing anonymous sources, which are often essential, when doing such reporting. Indeed, some of the sources he relied on for the news articles at issue in this litigation had been reliable sources for him on prior stories. For example, Mr. Zhao had been a source for Mr. Meng on a series of stories about Liu Zhijun, a transportation minister who Mr. Zhao had told him was involved in billions of dollars of corruption. In 2011, Mr. Liu was arrested for corruption and Mr. Meng's reporting was proven to be accurate. Similarly, Source A had proven to be reliable with regard to information about the corruption investigation of Bo Xilai.

63. The reporting at issue in this case involved allegations of corruption at the highest levels of the Chinese government and Chinese society. Anonymous sources are essential for such reporting. One need look no further than the first page of *The New York Times* and *The Washington Post* to see how important anonymous sources are to news organizations. It was entirely proper for Mr. Meng to put his faith in sources who had proven to be reliable in the past and to promise those sources confidentiality. Mr. Meng is doing what countless journalists have done in the past by protecting those sources from arrest or worse if their names are disclosed in this litigation.

64. It is not necessary to know the names of Mr. Meng's sources to assess his subjective state of mind at the time he published the articles at issue in this case. A review of the

information those sources provided, the corroborating information available to Mr. Meng, and his efforts to gather additional information from within a country that makes such investigations nearly impossible, shows that Mr. Meng acted reasonably and that he neither knew that the information he published about Ms. Zhang was false nor did he entertain serious doubts as to the truth of what he published.

I declare under penalty of perjury that the foregoing is true and correct, and if called as a witness could testify competently thereto.

Dated: Nov. 20, 2012

DAVID S. ARDIA

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ZHANG ZIYI, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>CHINA FREE PRESS, INC., a North Carolina non-profit corporation doing business as BOXUN NEWS; WEICAN NULL MENG, an individual known as WATSON MENG and also WEICAN "WATSON" MENG; DOES 1-25, inclusive,<br><br>Defendants. | Case No. CV12-5216-DMG (PLAX) |

## **EXPERT REPORT OF DAVID S. ARDIA, ESQ.**

## **APPENDIX A**

# DAVID S. ARDIA

UNC School of Law ▪ Van Hecke-Wettach Hall ▪ Chapel Hill, NC 27599
919-962-8955 ▪ ardia@unc.edu

## CURRENT POSITIONS

**UNC School of Law**, Chapel Hill, NC                                                          2011-present
*Assistant Professor*
*Co-Director, UNC Center for Media Law and Policy*

Research and teach in the areas of media law, cyberlaw, and intellectual property. Serve as co-director of the UNC Center for Media Law and Policy, a joint center between the UNC School of Law and UNC School of Journalism and Mass Communication. Secondary appointment as an Assistant Professor, UNC School of Journalism and Mass Communication.

**Berkman Center for Internet & Society, Harvard Law School**, Cambridge, MA         2007-present
*Faculty Associate (2011-present)*
*Resident Fellow (2007-2011)*

Participate in life of interdisciplinary research center that investigates the boundaries in cyberspace between open and closed systems of speech, commerce, and governance, and the relationship of law to each. Formerly founded and directed the Berkman Center's Digital Media Law Project, which provides legal assistance, education, and research for journalists, journalism organizations, and other digital media creators.

## EDUCATION

**Harvard Law School**, Cambridge, MA
LL.M., June 2007

   Areas of study: Legal Theory and Jurisprudence

**Syracuse University College of Law**, Syracuse, NY
J.D., *summa cum laude*, May 1996

| | |
|---|---|
| Honors: | Order of the Coif; Justinian Honorary Law Society; Law Review Distinguished Service Award; Robert M. Anderson Publication Award; Pomeranz Scholarship; Dean's List (all years); Award for Highest Grade in Civil Procedure, Evidence, and Legal Research and Writing |
| Activities: | Lead Articles Editor, *Syracuse Law Review*; Member, Moot Court Honor Society |
| Publication: | Dolan v. City of Tigard: *Takings Doctrine Moves Onto Unpaved Ground*, 24 REAL ESTATE L.J. 195 (1996) (also selected by *Syracuse Law Review*) |

**State University of New York College of Environmental Science and Forestry**, Syracuse, NY
M.S., Environmental Science, May 1995

   Area of study: Environmental Modeling, Risk Assessment, and Public Policy; M.S. Report: THE ROLE OF MODELING IN LAKE ONTARIO FISHERIES MANAGEMENT (1995)

**Clarkson University**, Potsdam, NY
B.S., Interdisciplinary Engineering and Management, May 1989

**DAVID S. ARDIA** / page 2

## PUBLICATIONS

### Books

- MEDIA AND THE LAW (Matthew Bender & Co., forthcoming 2013) (co-authored with David Kohler, Lee Levine, Dale Cohen, and Mary-Rose Papandrea).

### Law Review Articles

- *Government Speech and Online Forums: First Amendment Limitations on Moderating Public Discourse on Government Websites*, 2010 BYU LAW REVIEW 1981 (2010).

- *Reputation in a Networked World: Revisiting the Social Foundations of Defamation Law*, 45 HARVARD CIVIL RIGHTS-CIVIL LIBERTIES LAW REVIEW 261 (2010).

- *Free Speech Savior or Shield for Scoundrels: An Empirical Study of Intermediary Immunity Under Section 230 of the Communications Decency Act*, 43 LOYOLA OF LOS ANGELES LAW REVIEW 373 (2010).

- *Does the Emperor Have No Clothes? Enforcement of International Laws Protecting the Marine Environment*, 19 MICHIGAN JOURNAL OF INTERNATIONAL LAW 497 (1998).

- Dolan v. City of Tigard: *Takings Doctrine Moves Onto Unpaved Ground*, 24 REAL ESTATE LAW JOURNAL 195 (1996).

### Work in Progress

- *Freedom of Speech, Defamation, and Injunctions* (examines the availability of injunctive relief in defamation cases).

### Other Publications

- *Bloggers and Other Online Publishers Face Increasing Legal Threats*, POYNTER ONLINE, Sept. 22, 2008, http://www.poynter.org/column.asp?id=101&aid=150968.

- *What Can You Say? A Look at Your Free Speech Rights in School*, THE NEXT STEP, Summer 1997, at 40 (co-authored with K. Gorman).

## COURSES TAUGHT

- Torts
- Media Law
- Media Law Practicum
- Internet and Society: Technologies and Politics of Control

## OTHER LEGAL EXPERIENCE

**The Washington Post**, Washington, DC                                      2004-2006
*Assistant Counsel*

Provided legal counsel to all parts of *The Washington Post* newspaper. Responsible for varied legal matters, including First Amendment, newsgathering, intellectual property, and general business issues. Provided pre-publication review for all sections of the newspaper. Gained extensive experience providing media law training to reporters and editors. Worked with counsel from other media organizations to develop strategies for dealing with important First Amendment issues, including court access, prior restraints, and the reporter's privilege.

DAVID S. ARDIA / page 3

**Williams & Connolly LLP**, Washington, DC                                        1999-2004
*Associate*

    Gained substantial experience litigating complex cases, including extensive experience with First Amendment and intellectual property litigation. Clients included broadcast networks, newspaper publishers, and magazine publishers. Provided pre-publication review for *The National Enquirer* and *In Touch Weekly*, and general legal advice for *Newsweek*.

**Judge Conrad K. Cyr**, U.S. Court of Appeals for the First Circuit                1998-1999
*Law Clerk*

    Researched and drafted judicial opinions and bench memoranda for civil and criminal appeals; attended oral argument.

**Judge Thomas J. McAvoy**, U.S. District Court, N.D.N.Y                           1996-1998
*Law Clerk*

    Researched and drafted judicial opinions and bench memoranda for criminal and civil matters. Drafted jury instructions, assisted in sentencings, and participated in chamber conferences.

**Cravath, Swaine & Moore**, New York, NY                                          Summer 1995
*Summer Associate*

    Worked in litigation department. Advised on patent and copyright issues.

**Professor Laura Lape**, Syracuse University College of Law                       1994-1995
*Research Assistant*

    Researched and analyzed various issues in copyright law.

## ACADEMIC PRESENTATIONS

**Freedom of Speech, Defamation and Injunctions**                                  March 2012
New York Law School, New York, NY

    Presented paper at Internet Law Works-in-Progress Symposium at New York Law School.

**Newsroom Law**                                                                   September 2011
Harvard Law School, Cambridge, MA

    Presented lecture on defamation and privacy law at "Law School for Digital Journalists" at Harvard Law School.

**Freedom of Speech, Defamation and Injunctions**                                  August 2011
DePaul University College of Law, Chicago, IL

    Presented paper at Intellectual Property Scholars Conference at DePaul University College of Law.

**Government Speech and Online Forums**                                            March 2010
Brigham Young University, Provo, UT

    Presented paper entitled "Government Speech and Online Forums: First Amendment Limitations on Facilitating and Moderating Public Discourse on Government Websites" at the *Brigham Young University Law Review* symposium on the Emerging Complexities of Government Speech.

DAVID S. ARDIA / page 4

## SELECTED LECTURES, CONFERENCES, AND SYMPOSIA

**Online News Association Annual Conference**                                September 2012
San Francisco, CA

   Presented lecture on defamation and privacy law at ONA's "Law School for Digital Journalists."

**Social Networks and the Law**                                              November 2011
UNC School of Law, Chapel Hill, NC

   Moderated panel on privacy issues and social media at the *North Carolina Law Review's* symposium on Social Networks and the Law.

**Media Law in the Digital Age**                                             September 2011
Kennesaw State University, Atlanta, GA

   Organized and moderated multiple panels examining new developments in media law and their impact on online journalism.

**Online News Association Annual Conference**                                November 2010
Washington, DC

   Presented talk on alternative business forms for online news startups.

**MIT Communications Forum**                                                 November 2010
Massachusetts Institute of Technology, Cambridge, MA

   Panelist on panel exploring how technology is influencing civic media and the law.

**Investigative Reporters and Editors Annual Conference**                    June 2010
Las Vegas, NV

   Panelist on panel addressing legal issues associated with launching a non-profit investigative center.

**Journalism's Digital Transition**                                          April 2010
Harvard Law School, Cambridge, MA

   Panelist and moderator for panel discussing anonymity, defamation, and privacy.

**National Association of Hispanic Journalists Annual Convention**           June 2009
San Juan, PR

   Panelist and moderator for panel entitled "Online Media Law and Ethics."

**Journalism that Matters, Poynter Institute for Media Studies**             March 2009
St. Petersburg, FL

   Led discussion on intellectual property and media law issues arising from innovative news platforms.

**New Media & the Marketplace of Ideas**                                     October 2007
Boston University School of Law, Boston, MA

   Panelist on panel entitled "Gatekeeping in the New Media Environment" at symposium organized by Boston University School of Law and Boston University College of Communication.

**DAVID S. ARDIA** / page 5

## ADMISSIONS AND MEMBERSHIPS

Admitted in New York; District of Columbia; Massachusetts; United States Supreme Court; and United States District Court for the District of Columbia. Member of the First Amendment and Media Litigation Committee of the American Bar Association; Arts, Entertainment, and Sports Law Section of the District of Columbia Bar; and New England Media Lawyers Group. Board Member of the American Association of Law Schools, Mass Communication Law Section Executive Committee (2011-present).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ZHANG ZIYI, an individual,<br><br>　　　　　Plaintiff,<br><br>vs.<br><br>CHINA FREE PRESS, INC., a North Carolina non-profit corporation doing business as BOXUN NEWS; WEICAN NULL MENG, an individual known as WATSON MENG and also WEICAN "WATSON" MENG; DOES 1-25, inclusive,<br><br>　　　　　Defendants. | Case No. CV12-5216-DMG (PLAX) |

**EXPERT REPORT OF DAVID S. ARDIA, ESQ.**

**APPENDIX B**

## Documents Reviewed in Connection with *Zhang Ziyi v. China Free Press, Inc. et al.*

- Complaint filed by Zhang Ziyi against China Free Press, Inc., et al., dated June 14, 2012
- Declaration of Professor Mary Hausch, dated August 16, 2012
- Supplemental Report of Findings by Mary Hausch, with attachments, dated October 24, 2012
- Supplemental Report of Findings by Mary Hausch, with attachments, dated November 12, 2012
- Letter from Mary Hausch to Marc Randazza transmitting November 14 Supplemental Report, dated November 14, 2012
- Declaration of Professor Karen List, dated November 6, 2012
- CV of Karen K. List, undated
- Declaration of Ye "Ken" Wang, dated August 15, 2012
- Deposition Transcript of Watson Meng (Volume I), dated October 12, 2012
- Deposition Transcript of Weican "Watson" Null Meng (Volume II), dated October 17, 2012
- Email from Watson Meng to David Ardia transmitting documents and news reports, dated November 15, 2012
- Summary by Watson Meng of information he relied on, undated
- Summary by Watson Meng of a Chinese news report published on January 19, 2010 on Sohu.com, undated
- Summary by Watson Meng of a Chinese news report published on January 22, 2010 on Sina.com.cn, undated
- *China police chief may seek U.S. asylum*, USA TODAY (Feb. 8, 2012)
- Jeremy Page, *Chongqing Mayor Reveals Role in Drama Outside U.S. Consulate*, WALL STREET JOURNAL (Mar. 6, 2012)
- Jamil Anderlini, *Bo fallout threatens China's security chief*, FINANCIAL TIMES (Apr. 20, 2012)
- *US website covering China's Bo Xilai scandal hacked*, BBC NEWS (Apr. 21, 2012)
- Richard McGregor, *Chinese censors hamstrung by US site*, FINANCIAL TIMES (Apr. 22, 2012)
- Jonathan Ansfield, *Ousted Chinese Leader Is Said to Have Spied on Other Top Officials*, N.Y. TIMES (Apr. 25, 2012)
- Adam Taylor, *Meet the Man Revealing the Huge Scandals that the Chinese Government Doesn't Want You to Know*, BUSINESS INSIDER (Apr. 25, 2012)

- Melina Liu, *Ambassador to China Gary Locke Talks Chen, Drama in China*, DAILY BEAST (May 28, 2012)